# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| STEVEN DARMER, | Civil No. 17-4309 (JRT/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT** |
| STATE FARM FIRE AND CASUALTY COMPANY, | |
| Defendant. | |

Edward E. Beckmann, **BECKMANN LAW FIRM, LLC**, 3800 American Boulevard West, Suite 1500, Bloomington, Minnesota 55431, for petitioner.

Lehoan T. Pham, Michelle D. Christensen, and Scott G. Williams, **HKM LAW GROUP**, 30 East Seventh Street, Suite 3200, Saint Paul, MN 55101, for defendant.

Plaintiff Steven Darmer's residence was badly damaged by fire in November 2016. Darmer filed a claim with his insurer, Defendant State Farm Fire and Casualty Company ("State Farm"). Unsatisfied with State Farm's adjustment of his claims, Darmer has brought suit against State Farm alleging breach of contract, insurance bad faith, violation of the Minnesota Human Rights Act, and negligent supervision, and requesting declaratory judgment on several issues related to the insurance policy. Before the Court are two Motions for Partial Summary Judgment. Darmer seeks partial summary judgment on his breach of contract and statutory interest claims, as well as his demand for an appraisal. State Farm requests partial summary judgment dismissing Darmer's claims of insurance bad faith, violation of the Minnesota Human Rights Act, and negligent supervision.

For the reasons set forth below, the Court will grant State Farm's motion for summary judgment in full. As to Darmer's motion for partial summary judgment, the Court will deny summary judgment on Darmer's request for appraisal and on Darmer's claim that he suffered a constructive total loss in May 2017. Finally, the Court will deny summary judgment for Darmer and instead grant summary judgment *sua sponte* for State Farm on Darmer's claims that he suffered a legal total loss in November 2016 and that he suffered a constructive total loss in December 2016.

## BACKGROUND

On November 15, 2016, a fire damaged Darmer's residence. (Decl. of Steve Darmer ¶ 2, Nov. 16, 2017, Docket No. 12.) Darmer filed a claim with his insurer, State Farm. (Aff. of Jene Jenkins-Jones ("Jenkins-Jones Aff.") ¶¶ 3–4, Dec. 7, 2017, Docket No. 18.)

## I. THE POLICY

Darmer has a homeowners-insurance policy with State Farm. (Decl. of Troy D. Brown ¶ 14, Ex. N (the "Policy") at 356, Nov. 16, 2017, Docket No. 14.)[1] Several provisions of the Policy are relevant to the current motions:

**Total Loss – Coverage A**

The limit of liability shown in the Declarations for Coverage A – Dwelling is the amount we will pay when there is a total loss to the dwelling caused by a Loss Insured. No deductible applies to the loss to the dwelling. This does not prevent the payment of an amount greater than the Coverage A limit of liability (wherever shown) when: 1. you elect to replace the dwelling; and 2. Option ID – Increased Dwelling Limit is shown in the Declarations.

. . .

**Concealment or Fraud**

---

[1] The page numbers cited to in record documents are the page numbers of the full PDF document contained in the Docketed document unless otherwise stated. Here, for example, page number 356 refers to page number 356 of the PDF for all the documents contained in Docket No. 14.

With respect to any occurrence or loss caused by fire, we do not provide any coverage to the insured who has: . . . (2) after a loss, willfully and with intent to defraud; concealed or misrepresented any material fact or circumstance relating to this insurance.

. . .

**Coverage C – Loss of Use**

**1. Additional Living Expenses**.  When a Loss Insured causes the **residence premises** to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months.  Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months.

. . .

**Section I – Loss Settlement** . . . **Coverage A – Dwelling**
**1.  A1 – Replacement Cost Loss Settlement – Similar Construction**
        a.  We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under Section 1 – Coverages, Coverage A – Dwelling . . . subject to the following:
           (1)  until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;
           (2)  when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less.

. . .

**Section I – Conditions**

. . .

2. **Your Duties After Loss.**  After a loss to which this insurance may apply, you shall see that the following duties are performed:

    a.  give immediate notice to us or our agent.

       . . .

    c.  prepare an inventory of damaged or stolen personal property. Show in detail the quantity, description, age, replacement cost and amount of loss.  Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

    d.  as often as we reasonably require:

       (1)  exhibit the damaged property;

       (2)  provide us with records and documents we request and permit us to make copies;

       (3)  submit to and subscribe, while not in the presence of any other insured:

          (a) statements; and

          (b) examinations under oath; and

       . . .

    e.  submit to us, within 60 days after the loss, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

       (1)  the time and cause of the loss;

       . . .

       (5)  specifications of any damaged building and detailed estimates for repair of the damage;

       (6)  an inventory of damaged or stolen personal property described in 2.c;

       (7)  receipts for additional living expenses incurred and records supporting the fair rental value loss; and

. . .

4. **Appraisal.**  If you and we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. . . .  The appraisers shall then set the amount of the loss.

. . .

8. **Loss Payment**.  We will adjust all losses with you.  We will pay you unless some other person is named in the policy or is legally entitled to

receive payment. Loss will be payable 60 days after we receive your proof of loss and:

    a. reach agreement with you;

    b. there is an entry of a final judgment; or

    c. there is a filing of an appraisal award with us.

(*Id.* at 358, 364, 374, 381, 383–84)

## II. STATE FARM'S ADJUSTMENT

### A. Proof of Loss

In December 2016, Darmer submitted his proof of loss, as required by the Policy, to State Farm. (Jenkins-Jones Aff. ¶ 9, Ex. 1.) Darmer claimed $524,800 for the dwelling and other structures and $330,624 for personal property and Additional Living Expenses ("ALE") but did not include the itemization required by State Farm. (*Id.*) A few months later, Darmer submitted a revised proof of loss, which substantially increased the claimed losses: $767,023.66 for the dwelling, $141,046.65 for other structures, $944,793.68 for personal property, and $1,098,987.05 for ALE. (Jenkins-Jones Aff. ¶ 19, Ex. 10.) Darmer's new proof of loss request totaled $2,950.951.04. (*Id.*) State Farm claims it was concerned by these increases, and by Darmer's lack of cooperation in its investigation. (*Id.* ¶¶ 5, 7, 22–25.)

### B. Dwelling

Darmer's policy includes coverage for the Dwelling and Dwelling Extension, as well as Increased Dwelling coverage. (Policy at 357.) The relevant limits of Policy A are $419,840 for the dwelling and $41,984 for the dwelling extension, for a total of $461,824. (Decl. of Edward E. Beckmann ("Beckmann Decl.") ¶ 2, Ex. A at 3, June 25, 2019, Docket No. 288.) Darmer's additional dwelling coverage, called Option ID, provides an additional

$83,968 for the dwelling. (*Id.*) In total, the policy limits for the dwelling (excluding additional sums for debris removal and landscaping) are $545,792. (*Id.*)

The relevant language of Darmer's policy as to his dwelling states that when there is a total loss, State Farm will pay policy limits. (Policy at 358.) Otherwise, State Farm will only pay "the actual cash value at the time of the loss," and will pay the remainder of coverage "when the repair or replacement is actually completed." (*Id.* at 381.)

Within three weeks of the fire, State Farm issued $259,337.85 to Darmer, as State Farm's calculated actual cash value. (Aff. of Tom Finney ("Finney Aff") ¶ 9, Aug. 28, 2018, Docket No. 108.) As its estimate updated or changed, State Farm made additional actual cash value payments to Darmer. (*Id.* ¶ 11.) In January 2017, State Farm paid $47,036.93; in April 2017 State Farm paid $13,565.81; on May 19, 2017, State Farm paid $55,100.72; on May 26, 2017, State Farm paid $18,343.69. (*Id.*) However, State Farm explains that this money was for the actual cash value—those payments were not for the repair or replacement, because State Farm had not received a repair contract from Darmer. (*Id.* ¶¶ 12–13.)

While waiting for Darmer's repair contract, State Farm made several internal repair cost estimates. On December 9, 2016, State Farm estimated the cost to repair or replace the dwelling at $517,614.44. (Beckmann Decl. ¶ 4, SEALED Ex. C at 8, Docket No. 291.) On May 19, 2017, State Farm issued another estimate, and determined the replacement cost for the dwelling to be $605,433.13. (*Id.* ¶ 8, Ex. G at 16, Docket No. 288.) Eventually, in August 2017, Darmer submitted a repair contract to State Farm, estimating a total repair cost of $954,385.05. (Sixth Affidavit of Scott G. Williams ("6th Williams Aff.") ¶ 5, Ex. 3 at 49, June 3, 2019, Docket No. 237.) Darmer signed the report contract on August 23,

2017.  (*Id.* at 53.)  Within days of receiving what it understood to be a valid repair contract, State Farm issued the remainder of the policy limits.  (Finney Aff. ¶ 13.)  State Farm later learned that Darmer had also signed an amendment to the repair contract the same day, lowering the total repair cost to $519,135.09.  (6th Williams Aff., ¶ 7, Ex. 5 at 127.)  This amendment raised concerns of fraud which are discussed below.

## C. Contents

In Darmer's revised proof of loss and contents claim, he listed more than 3,200 items, with what State Farm claims is an unusual number from the prior four years. (Jenkins-Jones Aff. ¶ 21.)  According to State Farm, it was concerned with Darmer's pricing, duplication, and the fact that Darmer was claiming $260,000 worth of items from the prior two years and $400,000 worth in the prior four years.  (*Id.*)  In order to better understand Darmer's claims, State Farm requested Darmer's financial records.  (*Id.* ¶ 23.) Darmer produced few responsive documents, but State Farm argues that these documents showed inflated values for claimed items, and that Darmer's net income was significantly lower than his stated purchase amounts.  (*Id.* ¶¶ 29–33.)  State Farm has advanced Darmer approximately $30,000 towards his contents claims.  (Ninth Aff. of Scott G. Williams ("9th Williams Aff.") ¶ 10, Ex. I at 55, Ex. J at 57, June 26, 2019, Docket No. 293.)

## D. Adjusted Living Expenses (ALE)

Additional Living Expenses ("ALE") is a benefit paid by State Farm after a loss to compensate for the additional costs of living when an insured is displaced from a residence. (Policy at 374.)  Per Darmer's policy, State Farm will pay ALE benefits "for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months."  (*Id.*)  State Farm paid ALE to Darmer

for 11 months, and then suspended payment.[2]  State Farm estimates that repairs on Darmer's house should have taken six to nine months and refused to continue paying once it believed that Darmer was dragging out the process.[3]  Additionally, State Farm had concerns about the more than $1,000,000 that Darmer requested in ALE, which he had not actually incurred and which State Farm believed did not approximate Darmer's standard of living.  (Jenkins-Jones Aff. ¶ 22.)  In total, State Farm avers that it has paid more than $30,000 in ALE benefits.[4]

## III.    THE ABATEMENT ORDER

On the day of the fire, the City of St. Paul issued an Emergency Summary Abatement order for Darmer's property.  (Beckmann Decl. ¶ 9, Ex. H at 10, June 25, 2019, Docket No. 288.)  The Abatement Order explains that that "an emergency situation exists which creates an imminent health or safety hazard or danger to the public that by its nature requires immediate action" and that the City would "immediately remove the severely fire damaged residential structures and garage."  (*Id.*)  Steve Magner, the City Code Enforcement Manager who issued the Abatement Order, testified that later that day the City came to the property to begin razing the structure.  (6th Williams Aff. ¶ 16, Ex. 14 at 197.)  State Farm made note of the City's intent to "demo the remaining structure" in its claim notes.  (Beckmann Decl. ¶ 5, Ex. D at 6, June 25, 2019, Docket No. 288.)

---

[2] Neither party submitted evidence for this fact, but the parties agree on the timeline in their briefing.  (State Farm Mem. Supp. Summ. J. at 26, June 25, 2019, Docket No. 280; Darmer Mem. Resp. at 17, July 16, 2019, Docket No. 300.)

[3] Similarly, the parties do not cite to the record but agree that State Farm had estimated a repair time of 6-9 months. (State Farm Mem. Supp. Summ. J. at 26; Darmer Mem. Resp. at 19.)

[4] State Farm did not provide a citation for this figure but merely included it in a footnote in their briefing.  (State Farm Mem. Supp. Summ. J.. at 26, n.19.)

That day, the City razed the garage and workshop, and then determined that it could "save this primary part of the structure." (6th Williams Aff. ¶ 16, Ex. 14 at 198.) Magner testified that he explained this result to Darmer, and also testified that the City did not want to have to raze the house. (*Id.* at 197–198.) He further testified that the City did not ever officially rescind its Emergency Order, but that the City had done what was needed "to abate the immediate hazard." (Tenth Aff. of Scott G. Williams ("10th Williams Aff.") ¶ 2, Ex. A at 9, July 16, 2019, Docket No. 298.) In Magner's view, "the insurance company has the right to try to salvage what they can, and . . . the owner has the right to salvage what they can." (*Id.*) The City has not moved forward because it is "hoping that Mr. Darmer can rehabilitate his structure, or if he chooses to raze that and build again, that's his choice." (*Id.*) Darmer was aware that the City had changed its position and that the house could be saved. (6th Williams Aff. ¶55, Ex. 53 at 318–19.)

To date, the City has not razed Darmer's house, and, at least as of May 2019, Darmer continues to repair it. (10th Williams Aff. ¶ 2, Ex. A at 9; 9th Williams Aff. ¶ 5, Ex. D at 39, Docket No. 293)

## IV.    APPRAISAL ISSUES

In November 2017, Darmer filed his first Motion to Compel an Appraisal. (Mot. to Compel Appraisal, Nov. 16, 2017, Docket No 10.) After briefing, the Magistrate Judge issued a Report and Recommendation ("R&R") denying the motion. (R&R, Feb. 26, 2018, Docket No. 34.) The Magistrate Judge interpreted the motion as one for summary judgment and recommended denial because there were significant facts in dispute. (*Id.* at 6, 12). On review, the Court adopted the R&R in full and denied Darmer's motion. (Order Adopting R&R at 13–14, July 6, 2018, Docket No. 57.) Among other findings, the Court

held there was a genuine issue of material fact as to whether Darmer had complied with his obligation to satisfy State Farm's reasonable requests for information and State Farm was therefore unable to determine a valuation – a prerequisite to an appraisal.  (*Id.* at 11–12.)

## V.  NONCOOPERATION AND FRAUD CONCERNS

Darmer's policy with State Farm is void if Darmer has "concealed or misrepresented any material fact or circumstance relating to this insurance." (Policy at 364.)  The Policy also required Darmer to cooperate with State Farm.  (*Id.* at 383.)

### A.  Repair Contract

State Farm alleges that Darmer misled State Farm by submitting a "false repair contract and associated estimate" on August 26, 2017.  (State Farm Mem. Supp. Summ. J at 6, n.2.)  Darmer's public adjustor, Troy Brown, submitted a repair contract from Ultimate Restoration to State Farm stating that the estimate for repairs was $954,385.05.  (6th Williams Aff. ¶ 5, Ex. 3 at 49.)  After receiving this contract, State Farm released the remainder of the dwelling policy limits on September 1, 2017, for a total of $551,688. (Finney Aff. ¶¶ 9, 11, 13.)  However, while deposing Chris Kosek, Darmer's expert and the president of Ultimate Restoration, State Farm discovered issues with the estimate.  (6th Williams Aff. ¶ 6, Ex. 4 at 126.)  On the same day that Ultimate Restoration issued the contract for $954,385.05, it also issued an amended contract, superseding the first, for only $519,135.09.  (*Id.* ¶ 7, Ex. 5 at 127.)  Darmer did not submit the revised contract to State Farm.  (*Id.* ¶ 8, Ex. 6 at 132.)[5]

### B.  Other Fraud Concerns

---

[5] Darmer also did not produce this contract in discovery.  Darmer's production, or lack thereof, of the revised repair contract and other documents is the subject of a recent Order Granting Sanctions and recommending future cross examination as to Darmer's discovery misconduct.  (Order Granting Sanctions, Oct. 28, 2019, Docket No. 327.)

State Farm argues that Darmer attempted to defraud the company in myriad other ways in the course of its investigation. These allegations are set out in detail in the Magistrate Judge's Report and Recommendations ("R&R") recommending denial of Darmer's First Appraisal Motion. (R&R at 4–6, Feb. 26, 2018, Docket No. 34.) State Farm's claims include allegations that Darmer grossly inflated the value of his personal property and the cost of his living expenses. (*Id.* at 4.) State Farm also alleges that Darmer's financial statements contradict his claimed purchases. (*Id.* at 5–6.) The Court agreed and found, in denying Darmer's first summary judgment motion, that: "[t]he record before the Court suggests that Darmer attempted to mislead State Farm about the value of his loss." (Order Adopting R&R at 12.)

### C. Failure to Cooperate

In opposing Darmer's First Appraisal Motion, State Farm similarly argued that Darmer had failed to cooperate as required under the contract. These allegations are also set out in detail in the R&R. (R&R at 3–6.) State Farm generally alleged that Darmer was obstructionist; that he refused to answer State Farm's questions, and that he produced irrelevant and nonresponsive information. (*Id.*) The Court agreed, and wrote that "the Court has a difficult time understanding—on this record—why Darmer believes that he has made a good-faith effort to comply with State Farm's reasonable requests. . . . On the record currently before the Court, Darmer has come nowhere close to establishing—for purposes of summary judgment—that he complied with his 'duties after loss.'" (Order Adopting R&R at 12.)

Since the First Appraisal Motion, State Farm alleges that it has obtained additional evidence of Darmer's obstruction. In particular, State Farm cites to an email from Darmer

to his public adjustor in which he writes "I would give out as little information as possible and try to turn it around on her either with due diligence, harassment, or a question on why she has not done something." (6th Williams Aff. ¶ 55, Ex. 53 at 331.) Darmer also wrote to Brown that "we are not going to put any effort into the response [to State Farm] until appraisal." (*Id.* at 341.) State Farm also notes that Darmer delayed sitting for an Examination Under Oath for a full year. State Farm requested the EUO on May 15, 2017; Darmer did not actually sit for the examination until May 15–16,2018, after an order from the Magistrate Judge. (9th Williams Aff., Ex. F at 43; Ex. G at 47, Docket No. 293.)

## VI.   DARMER'S INTERACTIONS WITH JENKINS-JONES

Jenkins-Jones was a State Farm adjustor assigned to adjust Darmer's claims for personal property and additional living expenses. (Jenkins-Jones Aff. ¶ 3.) Her supervisor was Tom Finney, a State Farm Team Manager. (Second Aff. of Tom Finney ("2d Finney Aff.") ¶ 2, June 3, 2019, Docket No. 236.)

On December 1, 2016, State Farm adjustor Jene Jenkins-Jones told Darmer's public adjuster Brown that she thought Darmer was "nice" but that "[h]e's just so cuckoo. He's not all there." (Fourth Decl. of Troy D. Brown ("4th Brown Decl."), Ex. A at 5, July 16, 2019, Docket No. 301.) She said this in the context of her issues with finding temporary housing for Darmer, and her difficulties in finding accommodation Darmer would agree with. (*Id.*) Approximately two weeks later, Darmer disclosed to State Farm that he had a mental disability, which included PTSD, depression, and anxiety. (9th Williams Aff. ¶ 3, Ex. B. at 26, Docket No. 293.)

Darmer stated in his deposition that Jenkins-Jones tried to stress him out by pushing him to find temporary housing, giving him arbitrary dates, and exaggerating the amount of

work he needed to complete.  (9th Williams Aff. ¶ 4, Ex C. at 5, June 25, 2019, Docket No. 279.)  Darmer also stated that Jenkins-Jones said that he was unreasonable or that he "had to be reasonable," and that her "tone of voice, her physical actions, and the way she treated" him were discriminatory.  (*Id.* at 6.)  Darmer also gave his view that State Farm deliberately put "so much stress on the policy owner that he caves in."  (*Id.* at 8.)

Darmer claims that State Farm failed to adequately supervise Jenkins-Jones. (Darmer Mem. Resp. at 40–41, July 16, 2019, Docket No. 300.)  Specifically, he claims that Jenkins-Jones's supervisor allowed her to stress Darmer with unreasonable requests and harassment even after State Farm became aware of his PTSD.  (*Id.*)  Finney testified that he spoke to Jenkins-Jones about her "cuckoo" statement, that she "expressed remorse," and that Finney "left it at that."  (Beckmann Decl. ¶ 4, SEALED Ex. C at 34, June 25, 2019, Docket No. 291.)  Finney also confirmed that he did not view this as harassing or discriminatory.  (*Id.*)  Jenkins-Jones continued to adjust Darmer's case, including asking questions that she saw as relevant and that Darmer considered to be harassing.  (9th Williams Aff. ¶ 4, SEALED Ex C. at 5, June 25, 2019, Docket No. 279.)

Darmer has asserted in discovery responses that he suffers from post-traumatic stress disorder ("PTSD") and depression and anxiety as a result of his PTSD.  (*Id.* ¶ 2, Ex. A at 18, June 25, 2019, Docket No. 278.)  Darmer claims that Jenkins-Jones's actions triggered a PTSD flashback and has exacerbated other "emotional distress and injury" connected to his PTSD.  (*Id.* at 19.)  He claims that his PTSD flashback caused a "total loss of energy and excessive sleeping."  (*Id.*)

VII.   PRESENT MOTION

On June 25, 2019, State Farm brought a Motion for Partial Summary Judgment requesting that the Court dismiss Darmer's insurance bad faith, violation of the Minnesota Human Rights Act, and negligent supervision claims. (State Farm Mot. Summ. J., June 25, 2019, Docket No. 275; State Farm Mem. Supp. Summ. J. at 1, Docket No. 280.) On the same day, Darmer brought a motion for Partial Summary Judgment for breach of contract, statutory interest, and an appraisal. (Darmer Mot. Summ. J., June 25, 2019, Docket No. 286; Darmer Mem. Supp. Summ. J. at 1, June 25, 2019, Docket No. 287.)

## ANALYSIS

## I.    SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256. But "[w]here the moving party fails to satisfy its burden to show initially the absence of a genuine issue concerning any material fact, summary judgment must be denied even if no opposing

evidentiary matter is presented." *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 393 (8th Cir. 1996).

Federal district courts may *sua sponte* grant summary judgment to a nonmoving party when the losing party is given sufficient advance notice and an adequate opportunity to submit evidence in opposition. Fed. R. Civ. P. 56(f)(1); *Chrysler Credit Corp. v. Cathey*, 977 F.2d 447, 449 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Interco Inc. v. National Sur. Corp.*, 900 F.2d 1264, 1269 (8th Cir. 1990)). Granting summary judgment under these circumstances accomplishes the primary objective of Rule 56 – expeditious disposition of cases. *Interco*, 900 F.2d at 1269.

The requirements of Rule 56(f) are met when the losing party moves for summary judgment on the relevant issue, because that party "obviously expect[s] the district court to make a final ruling" and agrees to resolution of the issue "in summary fashion." *Johnson v. Bismarck Pub. Sch. Dist.*, 949 F.2d 1000, 1005 (8th Cir. 1991); *see also Lester v. Wildwood Fin. Grp., Ltd.*, 205 F.3d 1346 (8th Cir. 2000) (finding summary judgment for a nonmoving party appropriate when "Lester initially moved the district court to rule on his employment status on a summary judgment basis and made no showing that he was not afforded a full and fair opportunity to develop the record") (internal punctuation omitted). By raising arguments in support of its own motion for summary judgment, the losing party has had an opportunity to develop the record on that issue. *Johnson*, 949 F.2d at 1005; *Barkley, Inc. v. Gabriel Brothers, Inc.*, 829 F.3d 1030, 1041 (8th Cir. 2016).

Sitting in diversity, the Court applies Minnesota substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).

## II.    PLAINTIFF'S MOTION

## A.    Breach of Contract and Statutory Interest

Darmer argues that State Farm breached its contract by failing to timely pay the policy limits on his insurance claims when he suffered a total loss.  To prevail on a breach of contract claim under Minnesota law, the plaintiff must prove "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (cleaned up). An insurance policy "must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning." *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310–11 (Minn. 1989) (cleaned up).

In Minnesota, when there is a total loss and in the absence of fraud, an insurer must pay "the whole amount mentioned in the policy." Minn. Stat. § 65A.08, subd. 2.  The Policy notes that "[t]he limit of liability shown in the Declarations for Coverage A – Dwelling is the amount we will pay when there is a total loss to the dwelling caused by a Loss insured." (Policy at 358.)  The Policy also notes that State Farm will pay more than Coverage A when "Option ID – Increased Dwelling Limit is shown in the Declarations."  (*Id.*)

### 1.    *Legal Total Loss*

Darmer argues that because the City issued an abatement order, the property was a total loss.  As a result, he asserts that State Farm was required to pay the policy limits by November 21, 2016.  Because State Farm did not pay the policy limits on the Dwelling until September 1, 2017, Darmer alleges breach of contract and seeks to recover statutory interest under Minn. Stat. § 549.09.

Darmer argues that the City's abatement order caused a total loss as a matter of law. Darmer cites to *Hertog v. Milwaukee Mut. Ins. Co.*, where the Minnesota Court of Appeals held that: "Generally, if repair or reconstruction of a damaged building is prohibited by a municipality acting under proper authority, the insured may recover from the insurer for a total loss." 415 N.W.2d 370, 372 (Minn. Ct. App. 1987) (cleaned up). In *Hertog*, the court found a total loss when an insured was prohibited from rebuilding an otherwise partial loss by a local ordinance. *Id.* at 373.

While an abatement order can, under certain circumstances, cause a total loss, those circumstances are not present here. On the same day that the City issued the abatement order, it razed Darmer's garage and workshop. The City then determined that the primary part of the structure was salvageable, and that it had abated the immediate hazard. The City informed Darmer of that fact. Unlike in *Hertog*, there is no legal or practical prohibition on Darmer to rebuild. To the contrary, not only has the City not razed Darmer's house, it has encouraged him to rebuild, and Darmer is repairing his home. Darmer has made no showing of a total loss.

State Farm did not breach the policy by failing to pay the policy limits on account of a legal total loss. Because Darmer's claim cannot succeed as a matter of law, the Court will deny summary judgment for Darmer and *sua sponte* grant summary judgment for State Farm under Rule 56(f) and dismiss Darmer's claims for legal total loss in November 2016 and accompanying statutory interest.

### 2.    *December 2016 Constructive Total Loss*

Darmer argues that the property was a constructive total loss in December 2016, and as a result, State Farm was required to pay out the full policy limits by December 9, 2016.

Because State Farm did not pay out the limits on the Dwelling until September 2017, Darmer alleges breach of contract and seeks to recover statutory interest.

Assuming that Minnesota law allows for constructive total loss in the case of fire insurance, the Minnesota Supreme Court has suggested that it would apply when "the expense of recovering or using the property exceeds its value" even if some or all of "the insured property is totally or partially uninjured." *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 299 (Minn. 1959).[6]

Darmer argues that a constructive total loss occurred when State Farm estimated the cost to repair and put the house back into use at $517,614.44 in December 2016. Darmer argues that this figure exceeds the policy limits of Coverage A ($461,824) and thus constitutes a constructive total loss.

Darmer's argument is belied by the Policy itself. The Total Loss section of the policy notes that State Farm will pay the policy limits of Coverage A, but that it will also pay a higher amount when an insured has purchased Option ID – Increased Dwelling Limit, as here. Coverage A, as noted by Darmer, has a policy limit of $461,824. However, Darmer had also purchased Option ID coverage, increasing the coverage limit by $83,968. In total, Darmer had dwelling coverage of $545,792.

State Farm estimated the loss at $517,614.44 in December 2016, which did not exceed Darmer's policy limit of $545,792. Darmer did not suffer a constructive loss in December 2016, and State Farm did not breach the policy by failing to pay the policy limits. Because Darmer's claim cannot succeed as a matter of law, the Court will deny summary

---

[6] Both parties cite to *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 299 (Minn. 1959), which discussed, without deciding, the possibility that constructive total loss might apply to fire insurance.

judgment for Darmer and *sua sponte* grant summary judgment for State Farm under Rule 56(f) and dismiss Darmer's claims for the December 2016 constructive total loss claim and accompanying statutory interest claim.

### 3. *May 2017 Constructive Total Loss*

Darmer also argues that the property was a constructive total loss in May 2017, and as a result, State Farm was required to pay out the full policy limits by May 24, 2017. Because State Farm did not pay out the limits on the Dwelling until September 2017, Darmer alleges breach of contract and seeks to recover statutory interest.

Darmer argues that there was a constructive total loss when State Farm estimated the cost to repair and put the house back into use at $605,455.13 in May 2017. As discussed above, the policy limits for the Dwelling were $545,792. Here, Darmer has shown that State Farm estimated the repair cost to exceed the policy limits.

However, State Farm raises affirmative defenses to its failure to pay—that the policy is void due to Darmer's fraud, concealment, and failure to cooperate. State Farm argues that Darmer's submission of false invoices, inflation of values on his proof of loss and inventory forms, and other evidence will demonstrate that Darmer intended to defraud State Farm. Furthermore, State Farm alleges that Darmer attempted to obstruct its investigation, and otherwise breached his duty to cooperate. If State Farm succeeds on its affirmative defense theory, it could be released from liability and potentially entitled to recover the monies already paid. Darmer disagrees with State Farm's characterization of his submissions and cooperation. This issue cannot be resolved on summary judgment because material facts remain in dispute, in particular regarding Darmer's state of mind and Darmer's credibility.

Because State Farm's affirmative defenses on this issue cannot be resolved on summary judgment, the Court will deny summary judgment for Darmer as to the May 2017 constructive total loss claim, as well as Darmer's claim for statutory interest.

**B.      Appraisal**

Darmer also brings a second motion seeking an appraisal. The Court denied his first motion seeking an appraisal because the Court found that the material fact of whether Darmer had made a good-faith effort to comply with State Farm's reasonable requests to document the loss was in dispute. Darmer contends that in the interim, State Farm has had an opportunity to finalize its investigation, and that as a result there is no longer a genuine issue of material fact. Specifically, Darmer argues that because he sat for the EUO, as ordered by the Magistrate Judge, he has complied with his obligations under the contract.

As the Court noted in denying Darmer's first motion for appraisal, "the Policy unambiguously envisions that the insured will provide State Farm with sufficient information to value the amount of loss" and complies with a list of duties. *Darmer v. State Farm Fire & Cas. Co.*, No. CV 17-4309 (JRT/KMM), 2018 WL 3325908, at *5 (D. Minn. July 6, 2018). The Court found that there was a genuine issue of material fact as to Darmer's compliance with these duties. *Id.* The Court noted that there was evidence that Darmer provided State Farm with nonresponsive and irrelevant documents, that he submitted documents inflating the value of his inventory, and that he dramatically overstated his loss to State Farm. *Id.*

So far as the Court can discern, the only changes since the Court previously denied summary judgment on this issue are the passage of time and the fact that Darmer sat for an EUO. Most, if not all, of the other factual disputes the Court flagged in its previous Order

remain.  Darmer has not shown, as a matter of law, that he complied with his contractual duty to cooperate.  To the contrary, there is at least as much uncertainty, if not more, about Darmer's actions and intent.

Darmer argues that by sitting for the EUO, he has wholly satisfied his obligations under the contract.  First, while sitting for the EUO was a contractual requirement, it was not Darmer's only contractual requirement, and Darmer has not shown that he has met these requirements.  The Court also notes that Darmer delayed the EUO for a year and did not sit for the examination until he was ordered to appear by the Magistrate Judge.  Second, even if sitting for the EUO were sufficient to demonstrate Darmer's compliance, the Court would still decline to grant summary judgment on this issue.  As noted above, State Farm raises a fact-based affirmative defense, arguing that the policy is void due to Darmer's fraud, concealment, and failure to cooperate.  If State Farm succeeds on its theory, the appraisal clause would be voided along with the rest of the policy.

Because genuine issues of material fact remain as to whether Darmer has reasonably complied with his "duties after loss" under the contract and whether the policy itself is void, the Court will deny summary judgment for Darmer as to his request for an appraisal.

## III.    DEFENDANT'S MOTION

### A.    Insurance Bad Faith

Darmer brought a claim against State Farm alleging it acted in bad faith in violation of Minn. Stat. § 604.18 by failing to appoint an appraiser, pay the policy limits, and other alleged contractual breaches.  State Farm has moved for summary judgment on  this claim.

Under Minnesota law, an insurer is liable for acting in bad faith if the insured can show:

(1) the absence of a reasonable basis for denying the benefits of the insurance policy; and

(2) that the insurer knew of the lack of a reasonable basis for denying the benefits of the insurance policy or acted in reckless disregard of the lack of a reasonable basis for denying the benefits of the insurance policy.

Minn. Stat. § 604.18, subd. 2(a).

An insurer, however, is not in violation if the insurer is "conducting or cooperating with a timely investigation into arson or fraud." Minn. Stat. § 604.18, subd. 2(c).

Minnesota law sets out two prongs—one objective and one subjective—that a plaintiff must prove to win an insurance bad faith claim. When considering the objective prong, "courts consider whether the claim was properly investigated and whether the results of the investigation were subjected to reasonable evaluation and review. Whether an insurer has acted reasonably in good or bad faith is measured against what another reasonable insurer would have done in a similar situation." *Friedberg v. Chubb & Son, Inc.*, 800 F. Supp. 2d 1020, 1025 (D. Minn. 2011).

When considering the subjective prong, courts consider what the insurer knew and when, and "[k]nowledge of the lack of a reasonable basis may be inferred and imputed to an insurer where there is reckless indifference to facts or proofs submitted by the insured." *Id.* However, "when a claim is fairly debatable, the insurer is entitled to debate it, whether debate concerns a matter of fact or law. Whether a claim is fairly debatable implicates the question whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded." *Id.* (cleaned up).

Although some of the facts surrounding State Farm's adjustment, loss investigation, and fraud investigation are in dispute, even after viewing all of those facts in the light most favorable to Darmer, no disputed fact could lead a reasonable jury to find for Darmer, and

the Court will grant summary judgment to State Farm.  *See Liberty Lobby*, 477 U.S. at 248;

*Matsushita*, 475 U.S. at 587.

### 1. Dwelling

Darmer alleges that State Farm acted in bad faith by not paying the policy limits after his property suffered a legal or constructive total loss in each of November 2016, December 2016 and May 2017.  As discussed above, Darmer's November 2016 legal total loss and December 2016 constructive total loss claims are without merit.  There was no total loss, and State Farm had no obligation to pay policy limits.

Darmer alleges that in May 2017, State Farm estimated that the total repair costs for his house would come to $605,455.13.  As discussed above, the policy limits for the Dwelling were $545,792.  Instead of paying out immediately, State Farm continued to request that Darmer submit the repair contract that it had been requesting since the fire in November 2016.  It is possible that State Farm erred in continuing to request the repair contract, given that State Farm's own estimates had now exceeded policy limits.  However, this estimate had been a moving target – Darmer's own estimates had ranged from $524,800 to $767,023.66, and State Farm's had been as low as $517,614.44.  Given that the precise repair cost had varied, and State Farm's reasonable assumption that Darmer would submit the expected repair contract any day, it was not objectively unreasonable for State Farm to wait and see what Darmer's repair estimate would be.  Once Darmer did submit the initial repair contract, for $954,385.05, State Farm immediately paid out the remainder of policy limits.  The immediate payment upon Darmer's submission of the contract is another objective indication of State Farm's good faith.

Neither was State Farm acting unreasonably from a subjective perspective. State Farm was reasonably concerned by the fact that Darmer had increased the claim on his dwelling by over $240,000 from his initial estimate, that he had not yet provided State Farm with a repair contract, that he was not cooperating with State Farm, and that he may have been inflating valuations or otherwise misleading State Farm in his submissions to the insurer. There is no indication that State Farm failed to evaluate the claim properly, failed to investigate the claim properly, or that State Farm disregarded relevant facts.

The Court does not reach the question of whether State Farm should have paid out policy limits on Darmer's dwelling claim in May 2017. State Farm's adjustment was, at the very least, debatable, and State Farm's actions were not unreasonable. State Farm is not liable under Minn. Stat. § 604.18 and the Court will grant summary judgment for State Farm as to Darmer's bad faith claim regarding the dwelling.

*2. Contents*

Darmer argues that State Farm acted unreasonably by asking follow-up questions about his claimed contents, specifically contents valued at under $500.

Darmer initially submitted a proof of loss to State Farm claiming approximately $300,000 in personal lost property. A few months later, Darmer increased this figure to approximately $944,000. Darmer's backup documentation for the higher claim included duplicative items, inflated pricing, and an unusually high percentage of recently-purchased items. Concerned by the revised proof of loss and the issues with the backup documents, State Farm requested Darmer's financial records. The limited documents that Darmer produced indicated that Darmer's claimed recent personal property purchases were in excess of his total income. State Farm requested that Darmer sit for an examination under

oath, and Darmer delayed for a year and did not sit for the examination until the Magistrate Judge ordered him to comply.

State Farm's requests for additional documentation were objectively reasonable given Darmer's requests and submissions. State Farm had (and continues to have) reasonable concerns about potential fraud, which it will present at trial. Furthermore, there is no evidence that State Farm was subjectively unreasonable. There is no indication that State Farm failed to evaluate the claim properly, failed to investigate the claim properly, or that State Farm disregarded relevant facts.

Additionally, State Farm is engaged in an investigation for fraud, and as a result, has declined to pay the remainder of Darmer's contents claim. As has been noted elsewhere, the fraud investigation provision in Minn. Stat. § 604.18 does not grant automatic immunity to an insurer upon opening a fraud investigation, "regardless of how flawed the investigation or how unreasonable the insurer's conclusion." *Borchardt v. State Farm Fire & Cas. Co.*, No. 016CV00055PJSKMM, 2017 WL 8315883, at *3 (D. Minn. Apr. 26, 2017). However, State Farm's investigation is objectively reasonable, given the facts of this case. The Court reads the provision in Minn. Stat. § 604.18, subd. 2(b) to cover cases like this one – where an insurer reasonably declines to pay additional monies while it is engaged in a reasonable fraud investigation.

The Court does not reach the question of whether State Farm's contents adjustment was correct. However, because State Farm was reasonably engaged in a timely investigation for fraud, and because their investigation was not unreasonable, State Farm is not liable under Minn. Stat. § 604.18 and the Court will grant summary judgment for State Farm as to Darmer's bad faith claim regarding the contents.

### 3. Additional Living Expenses

Darmer alleges that State Farm acted in bad faith by not paying sufficient ALE and by stopping ALE payments before it was entitled to do so. Specifically, Darmer argues that State Farm acted in bad faith by requiring Darmer's ALE to be "reasonable."

Darmer claimed ALE benefits of more than $1 million in the first five months after the fire although he had not incurred that amount. State Farm estimated that repairs to Darmer's house should take approximately 6-9 months. ALE is intended for the time it takes to repair or replace the dwelling. After Darmer had not submitted the requested repair contract for 11 months, State Farm ceased paying ALE benefits.

State Farm's actions were both objectively and subjectively reasonable. State Farm was concerned that Darmer was abusing the ALE payout and dragging his feet on submitting the repair contract. There is no indication that State Farm failed to evaluate the claim properly, failed to investigate the claim properly, or that State Farm disregarded relevant facts.

The Court does not reach the question of whether State Farm's ALE payout was correct. However, State Farm's adjustment of Darmer's ALE claim was not done in bad faith. State Farm's adjustment was, at the very least, debatable, and State Farm's actions were not unreasonable. State Farm is not liable under Minn. Stat. § 604.18 and the Court will grant summary judgment for State Farm as to Darmer's bad faith claim regarding ALE.

Because Darmer cannot show that State Farm acted unreasonably in its adjustment for Darmer's dwelling, the contents, or ALE benefits, the Court will grant State Farm's motion for summary judgment and dismiss Darmer's claims under Minn. Stat. § 604.18.

### B.     Violation of the Minnesota Human Rights Act

Darmer brought a claim against State Farm alleging that it violated the Minnesota Human Rights Act by discriminating against him. Specifically, he alleges that State Farm took unreasonable positions in its claims adjustment because Darmer has PTSD.

Minnesota Human Rights Act ("MHRA") prohibits discrimination by a business and makes it an "unfair discriminatory practice . . . to discriminate in the basic terms, conditions, or performance of the contract because of a person's . . . disability, unless the alleged refusal or discrimination is because of a legitimate business purpose." Minn Stat. § 363A.17. Because Darmer has not presented any direct evidence of discrimination, the Court will review the matter under the burden-shifting *McDonnell Douglas* test. 411 U.S. 792 (1973). Darmer has the burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If he is successful, State Farm must show a legitimate, nondiscriminatory rationale; Darmer would then need to show the rationale was pretextual. *Id.* at 802, 804.

To make a prima facie case, Darmer must demonstrate (1) that he is disabled, (2) that State Farm was aware that he was disabled, (3) that State Farm took adverse action against him, and (4) a causal connection between the adverse action and his disability. Darner has met the first element, and State Farm did become aware of Darmer's disability in the course of its adjustment, meeting the second element. The Court will assume an adverse action for the purposes of this motion, meeting the third element. However, Darmer has not demonstrated that State Farm took any action because of his disability.

Darmer's argument is based on Jenkins-Jones's statement to Darmer's public adjustor that Jenkins-Jones thought Darmer was "just so cuckoo. He's not all there." The statement by Jenkins-Jones predates State Farm's or Jenkins-Jones's knowledge of

Darmer's alleged disability. State Farm could not have discriminated against Darmer "because of" his disability if it was not aware of his disability.

Darmer argues that, while Jenkins-Jones's statement may have preceded State Farm's knowledge of his disability, State Farm's adjustment and valuation were laced with discriminatory animus. Darmer does not provide a single fact indicative of animus. Darmer suggests that State Farm's demands for information about his claims and State Farm's encouragement of cooperation with the City of St. Paul, among other things, indicate State Farm's discriminatory treatment. However, Darmer has not shown that State Farm demanded information or suggested cooperation because of his disability.

As with Darmer's bad faith claims, the Court does not reach whether State Farm made correct decisions in its investigation or its adjustment. However, because Darmer has not demonstrated a prima facie claim for discrimination, the Court will grant State Farm's motion for summary judgment on Darmer's MHRA claim under Minn. Stat. § 363A.17.

### C.    Negligent Supervision

Darmer brought a negligent supervision claim against State Farm alleging that it owed him a duty of care to supervise Jenkins-Jones and that it breached this duty, causing Darmer damages. Darmer alleges that State Farm was aware of his PTSD, that Jenkins-Jones' asked irrelevant questions which amounted to harassment, that these questions exacerbated Darmer's PTSD, and that Jenkins-Jones' supervisor did not stop her actions.

Negligence has four elements under Minnesota law: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered an injury. *Hudson v. Snyder Body,*

*Inc.* 326 N.W.2d 149, 157 (Minn. 1982).  Minnesota law narrows these elements for negligent supervision claims.  In a negligent supervision case, a plaintiff must prove that an "employee's conduct was foreseeable and that the employer failed to exercise ordinary care when supervising the employee."  *Oslin v. Minnesota*, 543 N.W.2d 408, 415 (Minn. 1996).  The injury must also be physical in nature as opposed to solely economic.  *Buytendorp v. Extendicare Health Servs., Inc.*, No. CIV. 04-4166 JRT/FLN, 2006 WL 314500, at *4 (D. Minn. Feb. 9, 2006) ("Minnesota courts have held that some form of physical injury is required to recover under a claim of negligent supervision."), *aff'd*, 498 F.3d 826 (8th Cir. 2007) (citing *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 533–34 (Minn.1992)).

Darmer does not allege that he suffered a physical injury.  Darmer argues instead that his PTSD was exacerbated by State Farm's conduct, and claims emotional distress and anguish.  Darmer argues, essentially, that because there are Minnesota statutes that include PTSD as a potential "personal injury," the Court should disregard precedent requiring a physical injury for employer negligent supervision claims.[7]  The Court declines to do so.

Darmer has presented no evidence of a physical injury or the threat of a physical injury as required by Minnesota law. As a matter of law, negligent supervision requires more.  The Court will grant Summary Judgment for State Farm and dismiss Darmer's negligent supervision claim.

## CONCLUSION

---

[7]Darmer points to points to *Daniel v. City of Minneapolis*, 923 N.W.2d 637, 646 (Minn. 2019) (quoting Minn. Stat. § 176.011, subd. 15(d)).  The case and the statute define PTSD as a personal injury.  Minn. Stat. § 176.011, subd. 15 & 16.  However, the statute is limited to the Minnesota workers' compensation system. *See id.* at subd. 1.  Darmer also argues that Minn. Stat. § 299A.475(a)(2) recognizes PTSD as a debilitating injury.  However, that section provides benefits to employees of law enforcement agencies and does not purport to define personal injury.

The Court will grant State Farm's Motion for Summary Judgment and dismiss Darmer's claims for Violation of Minn. Stat. § 604.18, Violation of the Minnesota Human Rights Act, and Negligent Supervision. Because genuine disputes of material fact remain as to Darmer's claims for Breach of Contract and Declaratory Judgment as relates to the appraisal and the May 2017 constructive total loss claim, the Court will deny Darmer's Motion on these issues. Finally, the Court will grant summary judgment *sua sponte* for State Farm on Darmer's claims that he suffered a legal total loss in November 2016 and that he suffered a constructive total loss in December 2016.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant's Motion for Summary Judgment [docket no. 275] is **GRANTED** and Darmer's claims for Violation of Minn. Stat. § 604.18, Violation of the Minnesota Human Rights Act, and Negligent Supervision are dismissed with prejudice.

2.  Plaintiff's Motion for Summary Judgment [docket no. 286] is **DENIED in part** and is **GRANTED in part to Defendant** as described herein. Darmer's claims for Declaratory Judgment and Breach of Contract are dismissed with prejudice to the extent he claims that he suffered a legal total loss in November 2016 and/or a constructive total loss in December 2016.

DATED:  January 31, 2020
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court